# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

AMIRAH SULTAANA,  )     Case No. 1:23-cv-01791
ADMINISTRATOR OF THE ) 
ESTATE OF HAKEEM )     Judge J. Philip Calabrese
SULTAANA, DECEASED, ) 
    )     Magistrate Judge Reuben J. Sheperd
    Plaintiff, ) 
    ) 
v. ) 
    ) 
MANSFIELD WARDEN TIM ) 
MCCONAHAY, *et al.*, ) 
    ) 
    Defendants. ) 
    ) 

## OPINION AND ORDER

Plaintiff Hakeem Sultaana, an Ohio prisoner incarcerated at the Ross Correctional Institution, filed this action without a lawyer against twelve Defendants, including prison staff, employees of the Ohio Department of Rehabilitation and Correction, and members of the Ohio State Highway Patrol.  The complaint alleges violations of Mr. Sultaana's federal civil rights under 42 U.S.C. § 1983 for incidents that allegedly occurred during his incarceration at the Mansfield Correctional Institution.  After more than a year of litigation, Mr. Sultaana passed away.  Pursuant to Rule 25(a)(1), Amirah Sultaana, Mr. Sultaana's mother and the administrator of his estate, was substituted as the proper party.  Defendants move for judgment on the pleadings.

## STATEMENT OF FACTS

On Defendants' motion for judgment on the pleadings, the complaint alleges the following facts, which the Court accepts as true and construes in the light most favorable to Plaintiff as the non-moving party, as it must in the present procedural posture.

### A.    Alleged Confidential Informant Agreement

In February 2020, Mr. Sultaana was transferred to the Mansfield Correctional Institution.  (ECF No. 1, ¶ 27, PageID #7.)  Several months after his arrival, Mr. Sultaana went to the office of Corrections Officers Dana Blankenship and Lisa Booth to resolve a pending informal complaint.  (*Id.*, ¶ 29, PageID #7.)  After resolution of the issue, Officer Blankenship allegedly asked Mr. Sultaana to provide her with any knowledge he had of illegal activity in his housing unit or the institution—specifically, information regarding corrections officers engaging in transactions of drugs and cell phones with inmates, which had resulted in recent terminations of prison staff.  (*Id.*, ¶ 30, PageID #7.)  Officer Blankenship allegedly told Mr. Sultaana that "it would be beneficial for [him] to participate" in providing knowledge about any such illegal activity.  (*Id.*, ¶ 32, PageID #7.)  According to Mr. Sultaana, he told Officer Blankenship that he "would ponder on her suggestion and would get back with her."  (*Id.*, ¶ 33, PageID #7.)

Within the week, Mr. Sultaana was sent to Officers Blankenship and Booth's office, where Officer Blankenship allegedly informed him that he "would fork over information in exchange that his judge be informed so [he] would receive judicial release" under Ohio law.  (*Id.*, ¶ 34, PageID #7.)  Further, Officer Blankenship

2

allegedly told Mr. Sultaana that she would consult with her boss, who the complaint refers to as Ms. McGuire, and talk to Officer Booth to confirm the arrangement. (*Id.*, ¶ 35, PageID #7.) Within another week, Officer Blankenship allegedly informed Mr. Sultaana that Ms. McGuire "gave confirmation and as long as [he] forked over credible information [his] request [regarding judicial release] was simple to perform." (*Id.*, ¶ 36, PageID #7.)

In the weeks that followed, Mr. Sultaana allegedly provided Officer Blankenship with information regarding the location of drugs and cell phones in the institution, resulting in their confiscation by prison officials. (*Id.*, ¶¶ 37–38, PageID #8.) Then, Mr. Sultaana claimed that Officer Blankenship told him that Ms. McGuire wanted to know about prison staff who were allegedly bringing in drugs and cell phones in exchange for money in Mr. Sultaana's housing unit. (*Id.*, ¶ 39, PageID #8.) Mr. Sultaana informed Officer Blankenship that he was a part of some of the transactions, which she relayed to Ms. McGuire and Officer Booth. (*Id.*, ¶¶ 40–41, PageID #8.) Mr. Sultaana described his role as being a confidential informant. (*Id.*, ¶ 11, PageID #3–4.)

## B. Alleged Sting Operation

After another week passed, Officer Blankenship allegedly informed Mr. Sultaana that the Ohio State Highway Patrol wanted to meet with him to set up a sting operation for the transaction of drugs and money with a corrections officer in his unit. (*Id.*, ¶ 42, PageID #8.) According to Mr. Sultaana, within a week, two unidentified members of the Ohio State Highway Patrol visited Mr. Sultaana and explained the planned sting operation to him. (*Id.*, ¶¶ 43–44, PageID #8.) They

3

provided Mr. Sultaana with a phone number that they told him to give to the corrections officer who was the target of the sting operation.  (*Id.*, ¶ 44, PageID #8.) Days later, Officer Blankenship provided Mr. Sultaana with a different phone number to give to the target corrections officer.  (*Id.*, ¶ 45, PageID #8.)

Mr. Sultaana questioned Officer Blankenship about his safety and what measures would be in place for him after the sting operation.  (*Id.*, ¶ 46, PageID #8.) Officer Blankenship allegedly told Mr. Sultaana that "the Ohio State Highway Patrol and her boss would handle everything and ensured [him] he would be getting judicial release anyway."  (*Id.*, ¶ 47, PageID #8.)  Also, Mr. Sultanna told Officer Blankenship that he was concerned because other inmates in his unit were asking about his many visits to her office, resulting in rumors and suspicion about his activities.  (*Id.*, ¶ 48, PageID #9.)  Mr. Sultaana alleged that Officers Blankenship and Booth ensured him that the sting operation would be a success and ignored his safety concerns and other issues.  (*Id.*, ¶ 49, PageID #9.)  However, Mr. Sultaana claimed that the officers came up with an idea for him to be the "law retriever" of legal documents for the inmates in his unit because the law library was closed because of Covid-19.  (*Id.*, ¶ 50, PageID #9.)  This way, Mr. Sultaana could visit Officers Blankenship and Booth's office daily without raising any suspicion among the other inmates.  (*Id.*, ¶ 51, PageID #9.)

Eventually, Mr. Sultaana forwarded the phone number to the target corrections officer as part of the alleged sting operation.  (*Id.*, ¶ 52, PageID #9.) According to Mr. Sultaana, the target corrections officer "called the same number not the one given to [Mr. Sultaana] by [Officer] Blankenship."  (*Id.*, ¶ 54, PageID #9.)

4

Further, the target corrections officer allegedly moved from his post at Mr. Sultaana's unit and "informed other inmates of [Mr. Sultaana's] plan." (*Id.*, ¶ 55, PageID #9.) Mr. Sultaana claimed that he told Officers Blankenship and Booth, Ms. McGuire, and members of the Ohio State Highway Patrol about this development, but they ignored him. (*Id.*, ¶ 53, PageID #9.)

Mr. Sultaana claimed that "rumors began to surface" about his involvement with Officers Blankenship and Booth. (*Id.*, ¶ 56, PageID #9.) Mr. Sultaana's mother, Amirah Sultaana, called the prison and Officers Blankenship and Booth's office to voice "grave concern over it all with anger." (*Id.*) Not long after, Mr. Sultaana claimed that the alleged sting operation halted because the target corrections officer no longer worked in Mr. Sultaana's unit. (*Id.*, ¶ 57, PageID #9.)

### C.    Alleged Incidents

According to Mr. Sultaana, he "complained constantly" regarding his placement in his unit to Warden Tim McConahay and Officers Blankenship and Booth, but they ignored him. (*Id.*, ¶ 58, PageID #9.) Following a security review of Mr. Sultaana in May 2021, his security level was dropped to a level two, and he was re-classed to the Grafton Correctional Institution. (*Id.*, ¶ 59, PageID #10.) In June 2021, Mr. Sultaana's unit manager, Ms. Jacobs, confirmed the re-classification. (*Id.*, ¶ 60, PageID #10.) However, Mr. Sultaana claimed that he was kept in his unit with level three inmates while the rest of the level two inmates were housed in another unit pending transfer. (*Id.*, ¶ 61, PageID #10.)

### C.1.    Assault on June 9, 2021

On June 9, 2021, Mr. Sultaana was sitting in the day room of his unit when another inmate allegedly punched him numerous times in his face and body, spit on him, and called him a snitch.  (*Id.*, ¶ 62, PageID #10.)  Mr. Sultaana claims to have suffered teeth, head, and other injuries.  (*Id.*, ¶ 63, PageID #10.)  Further, one of his teeth was cracked and eventually fell out.  (*Id.*, ¶ 3, PageID #2.)  This assault was allegedly captured on surveillance.  (*Id.*, ¶ 6, PageID #3.)  According to Mr. Sultaana, he was taken to medical following the incident, but prison officials did not complete all of the required paperwork and "lodged incorrect information" on his patient records.  (*Id.*, ¶ 64, PageID #10.)  After Mr. Sultaana was taken to dental, he claimed that he was hauled to the hole—formally known as the transitional program unit— despite not being under investigation or receiving any report of conduct violating ODRC policy.  (*Id.*, ¶ 65, PageID #10.)  A week later, Mr. Sultaana was returned to his unit.  (*Id.*, ¶ 67, PageID #10.)  Mr. Sultaana claimed that his alleged assailant's conduct report was "thrown out," contrary to ODRC policy.  (*Id.*, ¶ 68, PageID #10.)

### C.2.    Alleged Harassment

Soon after the alleged June 9, 2021 assault, according to Mr. Sultaana, Sergeant Brooke Lower, who was part of his unit staff, started harassing him, asking him why he was going to the inspector's office so much, and telling him that the other inmates thought that he was snitching.  (*Id.*, ¶ 69, PageID #10.)  According to Mr. Sultaana, he complained about this harassment to Warden McConahay and Officer Blankenship, but he was ignored.  (*Id.*, ¶ 70, PageID #10.)  Further, he claimed that his cell "constantly was getting searched and [he] was constantly harassed by

6

unit . . . staff," but he still was not moved to the unit with the other level two inmates. (*Id.*, ¶¶ 71–72, PageID #10–11.)

### C.3.  Assault on September 15, 2021

On September 15, 2021, an inmate in Mr. Sultaana's unit allegedly informed Sergeant Lower that he had to leave the unit because of a drug debt to the Bloods gang and that the gang "would take it out on [Mr. Sultaana] pertaining to the debt and overall issues pertaining to [him]." (*Id.*, ¶ 73, PageID #11.)  Also, the inmate informed Mr. Sultaana, who then told corrections officers at the front desk, but he claimed he was ignored. (*Id.*, ¶¶ 74–75, PageID #11.)  Later that day, another inmate assaulted Mr. Sultaana with a weapon and knocked him unconscious. (*Id.*, ¶¶ 76–77, PageID #11.)  Mr. Sultaana was taken to the emergency room to receive stiches and other treatment, and he claimed that his face was swollen. (*Id.*, ¶¶ 77–78, PageID #11.)  This assault was also allegedly captured on surveillance. (*Id.*, ¶ 6, PageID #3.)

### C.4.  The TPU Confinement

When Mr. Sultaana returned to the prison, he "was placed in the hole TPU [transitional program] unit over his objection." (*Id.*, ¶ 79, PageID #11.)  On or about the next day, Ms. Jacobs and Ms. McGuire visited Mr. Sultaana and allegedly told him that he could return to the general population if he signed a waiver. (*Id.*, ¶ 80, PageID #11.)  Mr. Sultaana refused and demanded judicial release based on his agreement to serve as a confidential informant. (*Id.*, ¶ 81, PageID #11.)  He averred that Ms. Jacobs and Ms. McGuire "just stared at [him] and informed [him] he would be out of the TPU unit within a day." (*Id.*, ¶ 83, PageID #11.)  But Mr. Sultaana alleged that he was not released from the transitional program unit for almost nine

months until his security review was due.  (*Id.*, ¶ 84, PageID #11.)  During that time, Amirah Sultaana called Officer Blankenship and Warden McConahay "for days around the clock" regarding the breach of their alleged agreement.  (*Id.*, ¶ 82, PageID #11.)  On September 18, 2021, Mr. Sultaana sent a kite from the transitional program unit complaining about his assault on September 15, 2021.  (ECF No. 1-23, PageID #86.)

Mr. Sultaana claimed that the manager of the transitional program unit, Kevin Shepard, as well as Ms. Jacobs, and two unidentified individuals kept him in the unit "without notice or process" and "pretended to do a sua sponte [protective custody]" pursuant to prison policy.  (*Id.*, ¶ 85, PageID #11.)  Further, Mr. Sultaana alleged that they did not inform him about any hearing, and no documentation existed regarding his placement in protective custody.  (*Id.*, ¶ 86, PageID #12.)  Then, ODRC allegedly re-classified Mr. Sultaana to Belmont Correctional Institution over his objection "even though [he] was already reclassed to Grafton via [a] security level drop."  (*Id.*, ¶ 87, PageID #12.)  He claimed that he remained in the transitional program unit "with all injuries."  (*Id.*, ¶ 88, PageID #12.)

### C.5.  Assault on October 14, 2021

Mr. Sultaana's cellmate in October 2021 "was a mental health patient blood gang member who smoked drugs."  (*Id.*, ¶ 89, PageID #12.)  Mr. Sultaana informed Mr. Shepard that being in the unit with this cellmate was a conflict because of his previous assault and that he did not want to be housed with a Blood gang member.  (*Id.*, ¶ 90, PageID #12.)  According to Mr. Sultaana, Mr. Shepard ignored his concerns and safety.  (*Id.*, ¶ 91, PageID #12.)

8

On October 14, 2021, Mr. Sultaana's cellmate assaulted him, causing injuries to his "rib and other places," along with "severe and significant physical and emotional injuries."  (*Id.*, ¶¶ 92 & 95–96, PageID #12.)  Then, his cellmate was removed from the cell and taken to mental health suicide watch.  (*Id.*, ¶ 93, PageID #12.)  Amirah Sultaana complained to prison officials again, but Mr. Sultaana claimed that Officer Blankenship and Mr. Shepard ignored her.  (*Id.*, ¶ 94, PageID #12.)  According to Mr. Sultaana, "no incident report was ever performed by ODRC." (*Id.*, ¶ 5, PageID #3.)

### D.    Mr. Sultaana's Grievances

Mr. Sultaana claimed that the grievance process in the prison was unavailable because "prison administrators thwarted and still [are] thwarting [him] from taking advantage of it through machination, misrepresentation, and intimidation."  (*Id.*, ¶ 26, PageID #6.)  He alleged that prison administrators accomplished this by (1) suspending him from the grievance system, (2) placing him in the transitional program unit for nine months for 22 hours a day, (3) assaults and threats, and (4) no access to the ODRC's prison visitation system.  (*Id.*)  Further, Mr. Sultaana claimed that Ross Correctional Institution, where he was housed when he filed his complaint, was "thwarting [his] ability to exhaust as well."  (*Id.*)

### D.1.   Grievance Process

However, on October 4, 2021, Mr. Sultaana filed a grievance from the transitional program unit against Warden McConahay complaining about the two assaults and issues that he had with the records filed about those incidents.  (ECF No. 1-7, PageID #42.)  Chief Inspector Chris Lambert responded to the grievance and

9

instructed Mr. Sultaana that the proper avenue for his complaint was to send a kite from the same kiosk instead of a direct grievance.  (*Id.*)

On October 7, 2021, Mr. Sultaana filed another grievance from the transitional program unit against Warden McConahay in which he sought mental health services and claimed that his previous kite was ignored.  (ECF No. 1-23, PageID #87.)  Chief Inspector Lambert responded that Mr. Sultaana could file a mental health complaint from the same kiosk and instructed him on the proper process to escalate a grievance to an appeal if he was unsatisfied with the response.  (*Id.*)

On November 1, 2021, Mr. Sultaana filed a grievance against Warden McConahay explaining that he had requested public records to learn the names of the individuals who assaulted him but never got an answer.  (ECF No. 1-19, PageID #65.)  Chief Inspector Lambert responded that it was not proper to use the grievance procedure to obtain records and explained the proper process for a records request. (*Id.*)  On November 6, 2021, Mr. Sultaana escalated a grievance to an appeal, complaining that he should not be housed in the transitional program unit and should be transferred to be housed with the other level two inmates.  (ECF No. 1-22, PageID #85.)

### D.2.  Amirah Sultaana's Records Requests

On September 22, 2021, Amirah Sultaana wrote to Warden McConahay making a public records request for the names of those involved in the assaults on her son, as well as the medical reports from these incidents.  (ECF No. 1-18, PageID #64.)  On October 7, 2025, Amirah Sultaana sent Warden McConahay a corrected

public records request that fixed the dates of the previous assaults. (ECF No. 1-20, PageID #66.)

On October 25, 2021, Amirah Sultaana sent a new public records request because the records she received following her previous request did not contain all of the information that she had requested. (*Id.*, PageID #74.) Amirah Sultaana filed additional public records requests on November 14 and 17, 2021. (ECF No. 1-20, PageID #79–82.)

On June 4, 2022, Amirah Sultaana mailed a complaint for a writ of mandamus to the Ohio Supreme Court requesting the names and medical records that were redacted in her public records request. (ECF No. 1-4, PageID #28.) On April 12, 2023, the Ohio Supreme Court granted in part and served the writ on the Mansfield Correctional Institution "to produce the incident and conduct reports it has already provided to [Amirah Sultaana] regarding the June and September 2021 assaults on [her] son, without redaction of the names and inmate numbers of the inmates involved in the assaults," as well as "any incident reports regarding the alleged October 2021 assault on [her] son," and any related conduct reports and disciplinary decisions. (ECF No. 1-3, PageID #26–27.)

### STATEMENT OF THE CASE

Based on these events, Plaintiff Hakeem Sultaana filed a *pro se* complaint, asserting claims against each Defendant in both their individual and official capacities under 42 U.S.C. § 1983. (ECF No. 1, ¶ 15, PageID #1 & #4.) Specifically, Plaintiff brought suit against Warden Tim McConahay, Officer Lisa Booth, Officer

Dana Blankenship, Sergeant Lower, Ms. McGuire, Ms. Jacobs, Kevin Shepard, two unidentified members of the Ohio State Highway Patrol, two unidentified employees at Mansfield Correctional, and the Ohio Department of Rehabilitation and Correction. (*Id.*, PageID #1.)

In Count One, Plaintiff alleges violations of Mr. Sultaana's First, Fourth, Eighth, and Fourteenth Amendment rights on the ground that Defendants "knowingly and with deliberate indifference to his constitutional rights failed to protect him in its venue when Defendants knew it was not safe, secure and appropriate and failed to provide proper monitoring and safety of inmates." (*Id.*, ¶¶ 15 & 98, PageID #4 & #13.) Further, Plaintiff claims that Defendants violated ORDC policies, practices, and customs by putting him at risk as a confidential informant without properly monitoring him. (*Id.*, ¶¶ 101–04, PageID #13–14.) Also, Plaintiff alleges that Defendants violated the Thirteenth Amendment by not acknowledging it, which is a "criminal offense and disrespectful." (*Id.*, ¶ 106, PageID #15.) Alternatively, Plaintiff claims that all Defendants are "liable for the actions of their employees or agents under various doctrines, such as agency and vicarious liability. (*Id.*, ¶ 107, PageID #15.)

Further, Plaintiff alleges that Mr. Shepard, Ms. McGuire, Ms. Jacobs, Sergeant Lower, and unidentified employees at Mansfield Correctional forced Mr. Sultaana to be placed in the transitional program unit "in retaliation, fraud and with precise coordination" with no notice or process in contravention of ODRC policy because he "call[ed] out Defendants['] breach of judicial release . . . for his

12

participation as a [confidential informant.]  (*Id.*, ¶ 16, PageID #4–5.)  Later in his complaint, Plaintiff claims that all of Defendants' actions "were directed at Plaintiff in retaliation."  (*Id.*, ¶ 108, PageID #15.)  Also, Plaintiff claims that Mr. Sultaana's confinement in the transitional program unit constituted "cruel and unusual punishment and due process issues."  (*Id.*)

Count Two of the complaint asserts a claim for ordinary negligence under Ohio law against all Defendants and alleges that "Defendants breached the duties owed to Plaintiff in their custody and were negligent in providing safety while being reckless in deploying Plaintiff as a [confidential informant]," including a failure to train and supervise on the part of ODRC.  (*Id.*, ¶¶ 112 & 115, PageID #16–17.)  Count Three alleges breach of contract against Officer Blankenship, Officer Booth, Ms. McGuire, and unidentified members of the Ohio State Highway Patrol regarding the alleged confidential informant agreement.  (*Id.*, ¶ 117, PageID #18.)  In Count Four, Plaintiff brings a claim for intentional infliction of emotional distress against all Defendants.  (*Id.*, ¶ 122, PageID #19.)  Finally, Plaintiff seeks punitive damages, which Plaintiff styles as Count Five, against all Defendants.  (*Id.*, PageID #20.)

Although Plaintiff filed suit on September 14, 2023, Plaintiff has yet to perfect service on Ms. McGuire, Ms. Jacobs, the unidentified members of the Ohio State Highway Patrol, and the unidentified employees at Mansfield Correctional. (ECF No. 10; ECF No. 11; ECF No. 16; ECF No. 17.)  On June 20, 2024, the remaining Defendants and the Interested Party State of Ohio moved for judgment on the pleadings.  (ECF No. 27.)

13

On November 5, 2024, the Court learned that Mr. Sultaana had passed away. (ECF No. 52.)  In January 2025, the Court appointed counsel to effect a proper substitution of parties.  (*See, e.g.*, ECF No. 60; ECF No. 63.)  Pursuant to Rule 25(a)(1), the Court substituted Amirah Sultaana as the proper party on June 17, 2025.  (ECF No. 66.)  Appointed counsel withdrew (ECF No. 70; ECF No. 71), and Amirah Sultaana filed 29 motions for leave to file a variety of affidavits, oppositions, supplements, and notices.  (ECF No. 69.)

## ANALYSIS

"The only difference between Rule 12(c) and Rule 12(b)(6)" is timing.  *Hunter v. Ohio Veterans Home*, 272 F. Supp. 2d 692, 694 (N.D. Ohio 2003).  Rule 12(c) provides that, once "the pleadings are closed" a party may "move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "A motion for judgment on the pleadings . . . generally follows the same rules as a motion to dismiss the complaint under Rule 12(b)(6)."  *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 480 (6th Cir. 2020) (citing *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014)); *see also Holland v. FCA US LLC*, 656 F. App'x 232, 236 (6th Cir. 2016).

Therefore, on a motion under Rule 12(c), courts "must follow the Supreme Court's changes to the pleading standards in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)."  *Bates*, 958 F.3d at 480 (citing *Engler v. Arnold*, 862 F.3d 571, 575 (6th Cir. 2017)).  "In other words, judgment on the pleadings is appropriate where, construing the material allegations of the pleadings and all reasonable inferences in the light most favorable to the non-moving

party, the Court concludes that the moving party is entitled to judgment as a matter of law.  *Anders v. Cuevas*, 984 F.3d 1166, 1174 (6th Cir. 2021).  In construing the pleadings, the Court accepts the factual allegations of the non-movant as true, but not unwarranted inferences or legal conclusions.  *Holland*, 656 F. App'x at 236–37 (citing *Gregory v. Shelby Cnty.*, 220 F.3d 433, 446 (6th Cir. 2000)).

While "[t]he court's decision rests primarily upon the allegations of the complaint[,]" "exhibits attached to the complaint may also be taken into account." *JTO, Inc. v. Travelers Indem. Co. of Am.*, 242 F. Supp. 3d 599, 602 (N.D. Ohio 2017) (citation modified).  Only "well-pleaded factual allegations" that "plausibly give rise to an entitlement of relief" and "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" will survive.  *Bates*, 958 F.3d at 480 (quotation and citation omitted).  Conversely, "[m]ere labels and conclusions are not enough[.]"  *Engler*, 862 F.3d at 575.  Nor are facts that are "merely consistent with" liability.  *Bates*, 958 F.3d at 480 (quotation omitted).

Although the pleadings and documents *pro se* litigants file are liberally construed and held to less stringent standards than the formal pleadings of lawyers, *Martin v. Overton*, 391 F.3d 710, 712 (6th Cir. 2004), *pro se* litigants are not exempt from the requirements of the Federal Rules of Civil Procedure.  *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989).  Even a *pro se* complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" to avoid dismissal.  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

In their motion for judgment on the pleadings, Defendants argue that Plaintiff's claims should be dismissed because (1) Plaintiff failed to exhaust available administrative remedies, (2) Plaintiff's complaint is barred by res judicata and issue preclusion, (3) Plaintiff's State law claims are time barred, (4) Plaintiff failed to describe Defendants' personal involvement in the alleged constitutional violations, (5) Plaintiff failed to sufficiently plead a claim for deliberate indifference, (6) Plaintiff failed to sufficiently plead a claim for retaliation, and (7) Defendants are entitled to Eleventh Amendment immunity.  (ECF No. 27, PageID #367 & #373–391.)

## I.      Exhaustion

Defendants argue that Plaintiff's complaint should be dismissed because he failed to exhaust available administrative remedies as the Prison Litigation Reform Act of 1996 requires.  (ECF No. 27, PageID #373–79; ECF No. 49, PageID #553–54.)

### I.A.    The Grievance Procedure

Ohio law provides a three-step inmate grievance procedure for all those in the custody of the Ohio Department of Rehabilitation and Correction.  Ohio Admin. Code § 5120–9–31(J).  First, within fourteen calendar days of the incident, the inmate must file an informal complaint resolution with "the direct supervisor of the staff member, or department most directly responsible for the particular subject matter of the complaint" that is specific as "to dates, times, places, physical descriptions of any unidentified personnel and the actions of said personnel giving rise to the complaint." *Id.* § 5120–9–31(J)(1).  The appropriate staff member then has seven calendar days to provide a written response.  *Id.*  If the staff member does not provide a response, the informal complaint step is waived, and the inmate may proceed to step two.  *Id.*

16

Second, if the inmate is dissatisfied with the response to the informal complaint (or if that step has been waived), the inmate may file a notification of grievance with the inspector of institutional services within fourteen calendar days after the completion of the informal complaint resolution. *Id.* § 5120–9–31(J)(2). Then, the inspector of institutional services has fourteen days to provide a written response to the grievance. *Id.* If a disposition has not been rendered after twenty-eight days from receipt of the grievance, the complaint is deemed unresolved, and the inmate may proceed to step three. *Id.*

Third, if the inmate is dissatisfied with "the disposition of grievance, the inmate may file an appeal with the office of the chief inspector" within fourteen calendar days of the disposition of grievance. *Id.* § 5120–9–31(J)(3). The chief inspector or his designee then has thirty days to provide a written response to the appeal. *Id.* "The decision of the chief inspector or designee is final." *Id.*

Grievances against the warden or inspector of institutional services—referred to as direct grievances—may circumvent this procedure. *Id.* § 5120–9–31(L). Direct grievances must be filed with the office of the chief inspector within thirty days of the event giving rise to the complaint and demonstrate that the warden or inspector of institutional services "was personally and knowingly involved in a violation of law, rule or policy, or personally and knowingly approved or condoned such a violation." *Id.* The chief inspector or his designee then has thirty days to provide a written response to the direct grievance. *Id.* His decision is final. *Id.*

17

### I.B.    The Prison Litigation Reform Act

Under the Prison Litigation Reform Act of 1996, a prisoner may not bring an action "with respect to prison conditions under section 1983 . . . until such administrative procedures as are available are exhausted."  42 U.S.C. § 1997e(a); *see also Surles v. Andison*, 678 F.3d 452, 455 (6th Cir. 2012).  Complete exhaustion is a mandatory requirement, meaning failure to exhaust cannot be excused, even under special circumstances.  *Ross v. Blake*, 578 U.S. 632, 638–39 (2016) (citing *Woodford v. Ngo*, 548 U.S. 81, 85 (2006); *Jones v. Bock*, 549 U.S. 199, 211 (2007)); *see also Porter v. Nussle*, 534 U.S. 516, 532 (2002) (holding that the "PLRA's exhaustion requirement applies to all inmate suits about prison life" including "whether they allege excessive force or some other wrong").  Even if the administrative process does not provide the monetary relief an inmate seeks, the inmate must first pursue all available administrative remedies before initiating suit.  *Porter*, 534 U.S. at 524.

The Act does not provide a uniform exhaustion standard.  Instead, the inmate's correctional institution defines the applicable administrative rules and procedures.  *Jones*, 549 U.S. at 218.  To comply with the exhaustion requirement, an inmate must "take advantage of each step the prison holds out for resolving the claim internally and by following critical procedural rules of the prison's grievance process."  *Lamb v. Kendrick*, 52 F.4th 286, 292 (6th Cir. 2022) (citation modified); *see also Woodford*, 548 U.S. at 90–91.  Compliance with these rules and procedures is required "even if the prisoner subjectively believes the remedy is not available . . . even when the state cannot grant the particular relief requested . . . and 'even where [the prisoners] believe the procedure to be ineffectual or futile . . . .'"  *Napier v. Laurel Cnty., Ky.*, 636

18

F.3d 218, 222 (6th Cir. 2011) (citations omitted).  Further, "an inmate cannot simply fail to file a grievance or abandon the process before completion and claim that he has exhausted his remedies . . . ."  *Hartsfield v. Vidor*, 199 F.3d 305, 309 (6th Cir. 1999) (citing *Wright v. Morris*, 111 F.3d 414, 417 n.3 (6th Cir. 1997)).

Failure to exhaust is an affirmative defense, meaning "inmates are not required to specially plead or demonstrate exhaustion in their complaints."  *Jones*, 549 U.S. at 216.  If an inmate fails to exhaust, the defendants may raise exhaustion as an affirmative defense on which they bear the burden of proof.  *Lamb*, 52 F.4th at 295 (quoting *Surles*, 678 F.3d at 457 n.10).  "[J]udges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury."  *Lee v. Willey*, 789 F.3d 673, 677–78 (6th Cir. 2016) (citations omitted).

"Although the PLRA's exhaustion requirement is strictly construed, the statute 'contains its own, textual exception to mandatory exhaustion' that applies when remedies are not 'available.'"  *Lamb*, 52 F.4th at 292 (quoting *Ross*, 578 U.S. at 642).  The statute expressly forecloses a federal action "until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  An administrative remedy is not available within the meaning of the statute to inmates and not subject to the exhaustion requirement where:  (1) the administrative grievance procedure "operates as a simple dead end"; (2) the administrative grievance procedure is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Ross*, 578 U.S. at 643–44.

19

### I.C.    Mr. Sultaana's Use of the Grievance Process

In the complaint, Plaintiff acknowledges that Mr. Sultaana did not exhaust his administrative remedies.  (ECF No. 1, ¶ 26, PageID #6.)  Therefore, Plaintiff must plead an exception to the exhaustion requirement.  *See Ross*, 578 U.S. at 643–44.  With an allegation that "[t]he grievance process was unavailable to [him] when prison administrators thwarted and still [are] thwarting Plaintiff from taking advantage of it through machination, misrepresentation, and intimidation," Plaintiff invokes the third exception.  (ECF No. 1, ¶ 26, PageID #6.)  Mr. Sultaana claimed that he was confined to the transitional program unit for 22 hours a day with no access to prison tablets or the prison visitation system, which would allow him to send kites.  (*Id.*)  Further, Plaintiff claims—without more—that "staff assaults and staff threats" also stood in Mr. Sultaana's way of following the grievance procedure.  (*Id.*)

### I.C.1. Plaintiff's Exhibits

The exhibits attached to Plaintiff's complaint tell a different story.  *JTO*, 242 F. Supp. 3d at 602 (acknowledging that "exhibits attached to the complaint[] also may be taken into account" for motions for judgment on the pleadings).  Mr. Sultaana claimed not to have access to the grievance system during his nine months in the transitional program unit following the assault on September 15, 2021.  (ECF No. 1, ¶ 26, PageID #6.)  But on September 18, 2021, Mr. Sultaana sent a kite complaining about his assault.  (ECF No. 1-23, PageID #86.)  According to the exhibit, "[t]his kite was addressed during seg rounds."  (*Id.*)  Notably, this correspondence fell within the 14-day window that Mr. Sultaana could have filed an informal complaint resolution

following his alleged assault, but he failed to do so properly.  *See* Ohio Admin. Code § 5120–9–31(J)(1).

On October 4, 2021, Mr. Sultaana filed a grievance against Warden McConahay, complaining about a lack of medical records regarding his assault and alleging a conspiracy and a cover up.  (ECF No. 1-7, PageID #42.)  The next day, Chief Inspector Lambert sent a response in which he instructed Mr. Sultaana how to send a kite from a kiosk and denied the kite to the extent that it was a direct grievance against the Warden "in accordance with administrative rule 5120-9-31, due to failing to establish the Warden violated a law, rule or policy or condoned such action by others."  (*Id.*)

On October 7, 2021, Mr. Sultaana filed a second grievance against Warden McConahay, complaining about a need for mental health services and his health care being ignored after the alleged assaults.  (ECF No. 1-23, PageID #87.)  The next day, Chief Inspector Lambert responded, explaining how Mr. Sultaana could file an informal complaint resolution in accordance with the administrative rules and how to escalate the informal complaint resolution to a grievance for further review and response and eventually an appeal.  (*Id.*)

On November 1, 2021, Mr. Sultaana filed a third grievance against Warden McConahay, requesting the names of the individuals who allegedly assaulted him.  (ECF No. 1-19, PageID #65.)  The next day, Chief Inspector Lambert again informed him that "[t]his [was] an improper use of the Inmate Grievance Procedure" due to the lack of personal involvement or approval by Warden McConahay and denied the

grievance.  (*Id.*)  Again, Chief Inspector Lambert explained to Mr. Sultaana how to make requests for records and kites.  (*Id.*)  On November 6, 2021, Mr. Sultaana escalated an appeal regarding his challenge to his unit housing.  (ECF No. 1-22, PageID #85.)

In an affidavit that Mr. Sultaana attached to his opposition to the motion for judgment on the pleadings, he claimed that he was not given "the opportunity to exhaust the Mansfield Correctional Institution grievance j-pay kiosk process" because his "hand tablet was taken away while [he] was unable to escalate or even get into the j-pay grievance system."  (ECF No. 47-1, PageID #549.)  Plaintiff attempts to clarify that he attached the correspondence with Chief Inspector Lambert to the complaint to demonstrate that Mr. Sultaana sought clarification on how to file grievances.  (ECF No. 47, PageID #541.)  But Mr. Sultaana sent all of the foregoing grievances from a kiosk in the transitional program unit, demonstrating that the inmate grievance procedure was in fact available to him during his time in the unit.  Further, in an affidavit attached to the complaint, Mr. Sultaana claimed that he "was hauled to TPU . . . the same day and [the] next day [he] communicated with prison officials and demanded release from the TPU . . . [and] communication was done . . . *on j-pay communication prison system*."  (ECF No. 1-9, ¶¶ 8–9, PageID #46 (emphasis added).)  Even ignoring the contradictions in Plaintiff's allegations, and assuming for the sake of argument that the j-pay communication system was not available to Mr. Sultaana, he must still have exhausted other "such administrative remedies as

22

are available" that prison officials explained to him. *Napier*, 636 F.3d at 223 (quoting 42 U.S.C. § 1997e(a)).

Despite attaching exhibits that demonstrate attempts to follow the inmate grievance procedure, Plaintiff fails to plead that Mr. Sultaana followed the steps for properly filing an informal complaint resolution, followed by a notification of grievance, and then an appeal. *Lamb*, 52 F.4th at 292; *see also Woodford*, 548 U.S. at 90–91. None of the grievances Mr. Sultaana filed pertain to any allegations of retaliation, breach of contract regarding the alleged confidential informant agreement, intentional infliction of emotional distress, or any policy associated with these claims. Inmates must exhaust remedies for their particular claims. *See, e.g.*, *Lyle v. Jackson*, 49 F. App'x 492, 494 (6th Cir. 2002). These procedures are important not only to reduce frivolous cases in federal court, but also because they afford prison officials the opportunity to rectify problems in their facilities. *Jones*, 549 U.S. at 219. Regardless of how ineffectual or futile Mr. Sultaana believed these rules to be, compliance is required to avoid dismissal. *Napier*, 636 F.3d at 222.

### I.C.2. Availability

The inmate grievance procedure was available to Mr. Sultaana within the meaning of the Prison Litigation Reform Act because he filed multiple other grievances during his time in the transitional program unit. *Blissit v. Fiquris*, 345 F. Supp. 3d 931, 940 (S.D. Ohio 2018) (determining that grievance procedures were available to an inmate who used them to file other grievances unrelated to the subject matter of the lawsuit). Not only do Mr. Sultaana's various attempts to file grievances directly contradict his allegation that prison administrators tried to thwart his

participation in the grievance process, but they demonstrate that the procedures were not so convoluted that an ordinary prisoner would be unable to use them.  Indeed, Chief Inspector Lambert explained to Plaintiff multiple times how to go about seeking his requested relief and the proper procedures to follow.  (*See, e.g.*, ECF No. 1-23, PageID #87.)  But nothing in the complaint or the attachments to it suggests that Mr. Sultaana did so.

Even viewing the facts in the light most favorable to Mr. Sultaana, as the Court must in the present procedural posture, the grievance procedure is not a "dead end" or "incapable of use."  Nothing but a conclusory allegation supports the claim that prison officials thwarted Mr. Sultaana from using it.  *See Ross*, 578 U.S. at 643–44.  Accordingly, Mr. Sultaana failed to exhaust his administrative remedies.  *Woodford*, 548 U.S. at 90.

### I.C.3. Plaintiff's Arguments

Plaintiff makes two arguments against judgment based on the defense of exhaustion.  The Court addresses each in turn.

### I.C.3.a. Screening

Plaintiff claims that, because the "complaint pass[e]d the initial screening of the PLRA this court has already determined, at this juncture that [Plaintiff's] complaint has sufficiently plead plausible claims for relief under applicable laws pertaining to this litigation."  (ECF No. 47, PageID #537 & #542.)  But Plaintiff conflates two separate procedures under the Prison Litigation Reform Act.  "[T]he PLRA not only imposed a new mandatory exhaustion requirement, but also departed in a fundamental way from the usual procedural ground rules by requiring judicial

screening to filter out nonmeritorious claims." *Jones*, 549 U.S. at 213. But "'failure to exhaust was notably not added' to the PLRA's screening provisions, which require judges to dismiss cases on specified grounds." *Perttu v. Richards*, 605 U.S. 460, 470 (2025) (quoting *Jones*, 549 U.S. at 214). Instead, as previously discussed, the Act's exhaustion requirement is an affirmative defense. *Id.* at 469.

Accordingly, the Court did not previously screen the complaint for exhaustion. Only now that Defendants have raised exhaustion as an affirmative defense has the Court analyzed this issue. *Id.* Therefore, Plaintiff is mistaken that it was already determined that the complaint satisfied the requirements of the Act.

### I.C.3.b. Intertwined with the Merits

Plaintiff claims that the "PLRA exhaustion and [First] Amendment Claim are intertwined with the merits of [the] claim." (ECF No. 47, PageID #542.) To state a claim for First Amendment retaliation, Plaintiff must plead that (1) he engaged in a constitutionally protected activity; (2) Defendants' adverse action caused him to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) the adverse action was motivated, at least in part, as a response to the exercise of Plaintiff's constitutional rights. *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000) (citations omitted).

### I.C.3.b.i. Constitutionally Protected Activity

As Plaintiff notes, the First Amendment protects the right to file a grievance. "It is well established that prisoners have a constitutional right to file grievances against correctional employees." *Pasley v. Conerly*, 345 F. App'x 981, 984 (6th Cir. 2009) (citing *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000)); *see also Violett v.*

*Reynolds*, 76 F. App'x 24, 27 (6th Cir. 2003) (determining that the use of the inmate grievance mechanism to file grievances is protected conduct).  As a qualification, a prisoner's First Amendment right to file institutional grievances without being subject to retaliation "only extends to the filing of non-frivolous grievances." *Walker v. Michigan Dep't of Corr.*, 128 F. App'x 441, 445–46 (6th Cir. 2005) (citations omitted).  But the pleadings do not show that any grievance filing was frivolous, and in the present procedural posture the Court would assume otherwise in any event.  Therefore, the Court treats Plaintiff as stating a claim based on a constitutionally protected right to file a grievance.  *See Pasley*, 345 F. App'x at 985 (determining that, because the plaintiff's threatened grievance was "arguably legitimate, his conduct was arguably protected by the First Amendment").

### I.C.3.b.ii. Adverse Action

In his opposition, Plaintiff cites *Richards v. Perttu*, 96 F.4th 911, 920 (6th Cir. 2024), in which the Sixth Circuit determined that the plaintiff "ma[de] out a prima facie case of First Amendment retaliation because [the defendant] allegedly destroyed [the plaintiff's] grievances in response to [the plaintiff's] attempted filing of those grievances."  *Id.*  Therefore, the Sixth Circuit concluded that "the factual disputes concerning exhaustion (i.e., whether [the defendant] prevented [the plaintiff] from filing those grievances) are intertwined with the merits of [the plaintiff's] retaliation claim."  *Id.*  There, the court concluded that the Seventh Amendment required a jury trial "when the resolution of the exhaustion issue under the PLRA would also resolve a genuine dispute of material fact regarding the merits of the plaintiff's substantive case."  *Id.* at 923.

Following Mr. Sultaana's death, Amirah Sultaana filed a notice of supplemental authority (ECF No. 68, PageID #767) informing the Court that the Supreme Court had ruled on the same case. *See Perttu*, 605 U.S. at 470. In *Perttu*, the Supreme Court affirmed the Sixth Circuit and held that "parties are entitled to a jury trial on PLRA exhaustion when that issue is intertwined with the merits of a claim protected by the Seventh Amendment." *Id.* at 479. Therefore, Plaintiff argues that "the issue of PLRA exhaustion is intertwined with [the] First Amendment claim and both issues will ultimately depend on whether the prison staff retaliated against Plaintiff or prevented him from filing grievances." (ECF No. 68, PageID #767.)

But the record here differs markedly from that in *Perttu*. In this case, Plaintiff's sole argument to excuse Mr. Sultaana's failure to exhaust is that the grievance process was unavailable to him because prison administrators thwarted his ability to file. (ECF No. 1, ¶ 26, PageID #6.) But the exhibits that Mr. Sultaana attached to the complaint demonstrate that Defendants did not thwart or interfere with his ability to use the grievance process. (*See, e.g.*, ECF No. 1-23, PageID #87.) To the contrary, they show that Mr. Sultaana had access to it and that Chief Inspector Lambert explained to him how to pursue his complaints. As the Sixth Circuit observed, a "jury trial is appropriate in these circumstances only if the district court finds that genuine disputes of material fact concerning PLRA exhaustion are 'decisive of the merits of the plaintiff's claim.'" *Richards*, 96 F.4th at 923 (citation omitted). Here, the record shows as a matter of law that Mr. Sultaana's confinement in the transitional program unit "would not deter a person of ordinary firmness from

27

pursuing non-frivolous grievances against prison officials." *Jackson v. Madery*, 158 F. App'x 656, 660 (6th Cir. 2005).

### I.C.4. Substitution

One final note on exhaustion.  Ordinarily, dismissal based on exhaustion is without prejudice.  *See Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999).  After Defendants' motion for judgment on the pleadings was fully briefed, Mr. Sultaana passed away.  (ECF No. 52.)  The Magistrate Judge determined that Plaintiff's Section 1983 claims survived Mr. Sultaana's death and ordered the substitution of Amirah Sultaana as the proper party under Rule 25(a)(1).  (ECF No. 66.)  The Court understands that Amirah Sultaana cannot exhaust the remedies in place of her son. But Ms. Sultaana chose to stand on the original complaint and the claims it asserted. The plain language of Section 1997e(a) states that a prisoner may not file suit pursuant to Section 1983 or any other federal law regarding prison conditions "until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).

In a similar situation, a district court outside this Court determined that a party who substituted for a deceased plaintiff still had to satisfy the exhaustion requirement of the Prison Litigation Reform Act.  In *Tretter v. Pennsylvania Department of Corrections*, No. 3:11-cv-00423, 2012 WL 360029, at *4 (M.D. Pa. Feb. 2, 2012), the plaintiff inmate passed away during the litigation and a family member was substituted in his place.  The substituted plaintiff did not dispute that the original plaintiff had failed to exhaust his remedies but argued that she was not subject to the exhaustion requirements of 42 U.S.C. § 1997e.  *Id.*  The court determined that the original plaintiff's "failure to exhaust preclude[d] Plaintiff from

28

maintaining the instant action" because the original plaintiff was a prisoner at the time of filing.  *Id.*  In other words, the court determined that, for purposes of exhaustion under the Act, it was the "plaintiff's status as a prisoner at the time of filing [that] was controlling and that his change of status . . . did not excuse [the] plaintiff from exhausting his administrative remedies."  *Id.* (citing *Ahmed v. Dragovich*, 297 F.3d 201, 206 (3d Cir. 2002)).  Therefore, the court dismissed the plaintiff's Section 1983 claims for failure to exhaust administrative remedies.  *Id.*  So too here.  Because Mr. Sultaana was a prisoner at the time that he filed the complaint, Plaintiff is not excused from exhausting administrative remedies.

*     *     *

For the foregoing reasons, the Court determines that Plaintiff failed to exhaust administrative remedies and that Defendants are entitled to judgment on the pleadings.  *Woodford*, 548 U.S. at 90.  Therefore, the Court **DISMISSES WITHOUT PREJUDICE** Plaintiff's claims under Section 1983.

## II.    State-Law Claims

Under federal law, "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a).  This grant of jurisdiction brings all claims arising from a common nucleus of operative fact before the Court.  *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 588 (6th Cir. 2016).

Even then, a court "may decline to exercise supplemental jurisdiction" in certain circumstances.  28 U.S.C. § 1367(c).  Supplemental jurisdiction "is a doctrine

29

of discretion." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).  To determine whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity[.]" *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see also James v. Hampton*, 592 F. App'x 449, 462–63 (6th Cir. 2015) (quoting *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1882 (6th Cir. 1993)).  Pursuant to 28 U.S.C. § 1367(c)(3), the Court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . [it] has dismissed all claims over which it has original jurisdiction."  Because the Court dismisses all claims over which it has original jurisdiction, it declines to exercise supplemental jurisdiction over Plaintiff's State-law claims and, therefore, **DISMISSES** them **WITHOUT PREJUDICE**.

## III.    Additional Procedural Issues

Before his death, Mr. Sultaana filed a motion to convert the motion for judgment on the pleadings to one for summary judgment.  (ECF No. 38.)  This motion was later withdrawn.  (*See* ECF No. 67.)  However, the Court acknowledges that, because (1) the allegations involve the grievance procedure as part and parcel to the pleadings, (2) Mr. Sultaana himself placed exhibits demonstrating that he had access to the grievance procedure before the Court, and (3) there is no question as to the authenticity or accuracy of these exhibits, the Court can consider them without converting the motion into one for summary judgment.  *JTO*, 242 F. Supp. 3d at 602.  Therefore, the Court declines to convert Defendants' motion for judgment on the pleadings to a motion for summary judgment.

30

On September 17, 2025, Amirah Sultaana filed 29 motions for leave to file, among other things, affidavits, oppositions, supplements, and notices.  (ECF No. 69.) Upon review of these motions, none clearly attempt to amend the original complaint. However, one of the filings seeks leave to file "Complaint Count:  Murder by Torture and Suppression of Legal Filings."  (ECF No. 69-22, PageID #1045.)  Construing this count as a claim for civil liability for a criminal act under Section 2307.60 of the Ohio Revised Code, the Court declines to exercise supplemental jurisdiction over it as well for the reasons already stated.

## CONCLUSION

Plaintiff Hakeem Sultaana made serious allegations that merit investigation and appropriate consideration.  The Prison Litigation Reform Act requires that he exhaust his administrative remedies before bringing a federal civil rights action.  This he failed to do.  Accordingly, those efforts fall to other authorities to undertake.  For this reason, and for all the foregoing reasons, the Court **GRANTS** Defendants' motion for judgment on the pleadings and **DISMISSES** Plaintiff's claims **WITHOUT PREJUDICE**.  (ECF No. 27.)

**SO ORDERED.**

Dated:  September 30, 2025

_____

J. Philip Calabrese
United States District Judge
Northern District of Ohio

31